State Of Maine                                    Superior Court
Cumberland, ss.                                   Civil Action
                                                  Docket No.: CV-16-422

```
Melanie T. Klein-Robbenhaar,   )
          Plaintiff,           )
                               )
                               )
     v.                        )
                               )
Husson University,             )
          Defendant.           )
                               )
```

STATE OF MAINE
Cumberland, ss, Clerk's Office
NOV 02 2016
RECEIVED

## Complaint and Demand For Jury Trial and Injunctive Relief Sought

Melanie T. Klein-Robbenhaar hereby complains against Husson University, as follows:

### Summary of the Action

1. Ms. Klein-Robbenhaar was set up to fail and fired by Husson University after she reported illegal sex discrimination, including that one of her supervisors arranged to have a subordinate he was having a sexual affair with hired to be the Director of Alumni Relations despite being less qualified and receiving much worse hiring evaluations than another female candidate.

2. After she complained, Ms. Klein-Robbenhaar was subjected to a hostile work environment, including being required to take a loyalty oath at a staff meeting and having her coworkers interrogated about whether Ms. Klein-

pg 150

Robbenhaar had been involved in the human-resources investigation into her supervisors' conduct.

3. Ms. Klein-Robbenhaar's supervisors then transferred her to a position which could not be done successfully without specialized trained which she did not have. Her supervisors then ordered that she be denied access to the software she needed to perform the new job. They then fired Ms. Klein-Robbenhaar for supposedly poor performance before she even finished her training for the new position they had made impossible for her to perform.

4. As a result of this intentional discrimination and retaliation, Ms. Klein-Robbenhaar is seeking all available remedies, including back pay and benefits, compensatory damages, injunctive relief, and attorney's fees and expenses.

## Parties

5. Plaintiff, Melanie T. Klein-Robbenhaar, is a citizen of the United States and is a resident of Bangor, Penobscot County, Maine.

6. Defendant, Husson University is a Maine corporation with an established place of business in Westbrook, Cumberland County, Maine.

## Jury Trial Demand

7. Under Me. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## Factual Allegations

8. Ms. Klein-Robbenhaar worked for Husson University from August 2010 until her employment was terminated on November 1, 2013.

9. Husson hired Ms. Klein-Robbenhaar as the Associate Director of Financial Aid.

10. In February of 2012, Ms. Klein-Robbenhaar was promoted to become the Director of Annual Giving.

11. In February of 2013, Ms. Klein-Robbenhaar was chosen to be on the official hiring committee for the important position of Director of Planned Giving.

12. In April of 2013, Ms. Klein-Robbenhaar received an annual performance review that was primarily positive and recommended only a few improvements.

13. In the several months after this performance review, however, Ms. Klein-Robbenhaar made protected reports of sex discrimination and was subjected to an increasingly hostile working environment by two superiors who had identified her as a whistleblower.

14. Less than two months after her favorable annual performance evaluation, on June 14, 2013, these two supervisors gave Ms. Klein-Robbenhaar a very negative review and she was placed on an unwarranted Performance Improvement Plan.

15. In the months of escalating hostility leading up to the unwarranted negative review in June, Ms. Klein-Robbenhaar's supervisors, Warren Caruso, the Executive Director of Development, and Tom Martz, the Vice-President for Advancement, engaged in what she believed to be illegal activities.

16. For example, Mr. Caruso engaged in a sexual affair with a female subordinate and then promoted her to be one of the Major Gift Officers.

17. Mr. Caruso then had the subordinate whom he was having a sexual affair with promoted again to be hired as the Director of Alumni Relations. Mr. Caruso intervened to have this woman hired for this positon even though she was less qualified than another woman who applied.

18. After presentations given by the top three candidates for this position, Husson's Development Office staff were required to submit official evaluations of the candidates and rank them in order. The staff overwhelmingly recommended the more qualified candidate, rather than the subordinate Mr. Caruso was having an affair with.

19. Despite these official evaluations, Mr. Caruso hired the subordinate he was having a sexual relationship with.

20. Ms. Klein-Robbenhaar reported to Husson her concern that the more qualified candidate was passed over by Mr. Caruso and that the less qualified candidate was hired.

21. As a result of an internal investigation based in part on Ms. Klein-Robbenhaar's report, Mr. Caruso was required to explain in writing to a human

resources representative the selection process that resulted in the subordinate Mr. Caruso was having a sexual relationship with being hired for the position.

22. When Mr. Caruso was appointed to the search committee for a new Director of Planned Giving position, he offered the position to his sister-in-law, Lyndy Rohman, before the scheduled interviews of the qualified applicants were actually conducted.

23. Before the interviews for this position took place, Ms. Klein-Robbenhaar was shown that Husson had already purchased plane tickets for Ms. Rohman to visit a major donor two months in the future.

24. Even though the interviewees included several qualified candidates, the position was given to Mr. Caruso's sister-in-law as he had promised her.

25. The Director of Planned Giving, Emily Shubert Burke, told Klein-Robbenhaar that Mr. Caruso and Mr. Martz were engaging in unethical and illegal behavior and resigned after reporting her concerns to Husson's Human Resources department.

26. Although Ms. Burke resigned because of Mr. Caruso and Mr. Martz's illegal conduct, Mr. Martz later falsely told members of the Board of Trustees that Ms. Burke resigned because she had debilitating mental health issues in order to hide the real reason for her resignation.

27. A Major Gift Officer also filed complaints against Mr. Caruso and Mr. Martz with Human Resources.

28. After Ms. Klein-Robbenhaar and others complained to Husson's Human Resources department, Mr. Caruso and Mr. Martz identified Ms. Klein-Robbenhaar as a whistleblower and her work environment increasingly hostile.

29. Mr. Caruso interrogated other Husson employees, including the assistant to the vice president, about whether Ms. Klein-Robbenhaar had been involved in the human resource's department's investigations into his and Mr. Martz's conduct.

30. Mr. Martz held a staff meeting and angrily ordered Ms. Klein-Robbenhaar to repeat a pledge of loyalty and confidentiality in front of the staff. He initially said he would direct every staff member to repeat the pledge, but then only required one other person to do so.

31. The increased hostility and harassment continued until June 14, 2013, when Mr. Martz and Mr. Caruso gave Ms. Klein-Robbenhaar an unwarranted negative performance review and unwarranted Performance Improvement Plan.

32. As a result of the harassment and hostile work environment created by Mr. Martz and Mr. Caruso after they identified Ms. Klein-Robbenhaar as a whistleblower, Ms. Klein-Robbenhaar began to suffer from depression and anxiety and required a medical leave of absence to treat those conditions.

33. Upon the advice of her physician, Ms. Klein-Robbenhaar began a medical leave on June 19, 2013, to treat her depression and anxiety, which required medication and outpatient psychotherapy.

41. The only things that changed before Ms. Klein-Robbenhaar's performance improvement plan period was slashed by more than two-thirds was that she took protected medical leave and was moved to a new position that she needed training to perform.

42. The only material "measure for improvement" listed by Mr. Caruso in the new Performance Improvement Plan was that she execute 25-30 reports on a weekly basis.

43. Ms. Klein-Robbenhaar was not yet trained in how to perform the reports required by the performance improvement plan, which were to be created using Husson's donor database software, Raiser's Edge.

44. In further frustration of Ms. Klein-Robbenhaar's opportunity to successfully complete the performance improvement plan, Mr. Caruso and Mr. Martz ordered that Ms. Klein-Robbenhaar be denied access to Raiser's Edge, even though she needed access to perform her duties as the Director of Prospect Research and satisfy the performance improvement plan.

45. Over the next four weeks, Ms. Klein-Robbenhaar repeatedly requested – and was repeatedly denied by Mr. Caruso and Mr. Martz – access to the Raiser's Edge software.

46. Ms. Klein-Robbenhaar was finally granted access to the Raiser's Edge software only after she complained to the Director of Human Resources.

47. Once she was finally granted access to the database, a month after her return to work and a month into the new performance improvement plan, a

training was scheduled for Ms. Klein-Robbenhaar to learn to use Raiser's Edge for the functions of the Director of Prospect Research position, but the training was not held until October 15, 2013, due to the trainer's scheduling constraints.

48. After the October 15, 2013 training, the trainer informed Ms. Klein-Robbenhaar that she would need additional training to learn how to format reports properly so she could produce the reports required by the new position and performance improvement plan.

49. Due to the trainer's scheduling constraints, the second training session was not scheduled to take place until early November 2013.

50. Husson terminated Ms. Klein-Robbenhaar's employment – ostensibly for poor performance – before that training, which she needed to perform her job, was scheduled to take place and before the timeline laid out in the new performance improvement plan.

51. On October 8, 2013, the day after Ms. Klein-Robbenhaar was released to work full time, Mr. Caruso met with Ms. Klein-Robbenhaar to review her work in the new position.

52. Mr. Caruso had previously given Ms. Klein-Robbenhaar a list of 15 individuals to research as the Director of Prospect Research, many of whom were never intended to be solicited for donations, but instead were particularly difficult individuals that Mr. Caruso and Mr. Martz already had information about.

53. This assignment was not given to further Husson's business goals, but was intended as a secret test of Ms. Klein-Robbenhaar's performance, and to create a justification for taking adverse action against her if Mr. Caruso or Mr. Martz could find fault with her research.

54. For instance, one individual Mr. Caruso gave Ms. Klein-Robbenhaar to research was Charles Baron, a deceased organized crime figure.

55. Following her meeting on October 8, 2013 with Mr. Caruso, Ms. Klein-Robbenhaar emailed Mr. Martz her findings, and he responded that her research was accurate.

56. Mr. Caruso then informed Ms. Klein-Robbenhaar that she should limit her research to 3 of the 15 names.

57. Following the October 15, 2013 Raiser's Edge training, Ms. Klein-Robbenhaar submitted her reports on those three individuals and Mr. Caruso responded on October 17 that her reports were "perfect." He then instructed her to begin researching a list of 100 other individuals.

58. Ms. Klein-Robbenhaar proceeded to research those individuals, and had gathered information on 50 or so of them before her employment was abruptly terminated two weeks later.

59. Even though her training on how to produce research reports was delayed and limited, Ms. Klein-Robbenhaar conducted research and provided it to all Husson staff who requested it.

60. Husson terminated Ms. Klein-Robbenhaar's employment on November 1, 2014.

61. This termination occurred only 6 weeks after Ms. Klein-Robbenhaar was released to return to work from medical leave and was simultaneously placed in a new position and put on a new performance improvement plan, only 3 weeks after she was released to return to work full time, and only 2 weeks after she finally received access to Raiser's Edge and limited training on using it to perform the new position.

62. The termination occurred a week before Ms. Klein-Robbenhaar could complete her Raiser's Edge training.

63. When asked for the reasons for the termination of Ms. Klein-Robbenhaar's employment, Mr. Caruso stated in a letter dated November 18, 2013, that she had not produced any "reports" using Raiser's Edge.

64. Since Mr. Caruso and Mr. Martz intentionally denied Ms. Klein-Robbenhaar the access she needed to Raiser's Edge to make these reports and that she had not yet had the opportunity to be fully trained in completing the reports with the Raiser's Edge software, this stated reason is false.

65. Husson's illogical and inaccurate reasons for firing Ms. Klein-Robbenhaar's, as stated by Mr. Caruso in his letter dated November 18, 2013, provide evidence of a cover-up for the real reasons for the termination of her employment.

66. On August 25, 2014, Ms. Klein-Robbenhaar filed a charge of discrimination with the Maine Human Rights Commission and federal Equal Opportunity Employment Commission charging discrimination based on her sex and disability and retaliation for protected complaints of sex discrimination.

67. On August 4, 2016, the Maine Human Rights Commission issued a notice of Right to Sue under the Maine Human Rights Act.

68. On August 23, 2016, the federal Equal Employment Opportunity Commission issued a Notice of Right to Sue under Title VII.

69. Husson's termination of Ms. Klein-Robbenhaar's employment was unlawful sex and disability discrimination and whistleblower retaliation.

70. Husson willfully violated Ms. Klein-Robbenhaar's rights under the federal Family Medical Leave Act by terminating her employment based on a reassignment and performance improvement plan that punished Ms. Klein-Robbenhaar for taking protected leave.

## Legal Claims

### I. Sex and Disability Discrimination and Retaliation

71. The allegations in paragraphs 1-69 are realleged.

72. As a direct and proximate result of Defendant's intentional discrimination and retaliation against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, 42 U.S.C. §1983, the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634, and the Maine Whistleblowers' Protection

Act. 26 M.R.S. §§ 831 et seq., Plaintiff has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

**Wherefore,** Plaintiff requests relief against Defendant as follows:

(a) Enter declaratory relief that Defendant violated Plaintiff's statutory civil rights to be free of sex discrimination, disability discrimination, and unlawful retaliation;

(b) Enter injunctive relief ordering Defendant to provide effective civil rights training for all employees in the development office on the requirements of all applicable laws prohibiting employment discrimination because of sex and unlawful retaliation against employees for complaining about sex discrimination – that must be completed within 60 days of the entry of Judgment for Injunctive Relief.

(c) Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement, or, in lieu thereof, front pay for future lost wages and benefits;

(d) Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(e) Award Plaintiff full costs and reasonable attorney's fees; and

(f) Award such further relief as is deemed appropriate.

## II. Family Medical Leave Act Retaliation

73. The allegations in paragraphs 1-69 are realleged.

74. As a direct and proximate result of Defendant's intentional and willful retaliation against Plaintiff for taking protected leave in violation of the Family Medical Leave Act and the Maine Medical Leave Requirements law, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

Wherefore, Plaintiff requests relief against Defendant as follows:

(g) Enter declaratory relief that Defendant violated Plaintiff's statutory civil rights to be free of retaliation for taking leave protected by the Family Medical Leave Act;

(h) Enter injunctive relief ordering Defendant to provide effective civil rights training for all employees in the development office on the requirements of the Family Medical Leave Act, including the prohibitions against retaliating against employees who take protected leave that must be completed within 60 days of the entry of Judgment for Injunctive Relief;

(i) Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement, or, in lieu thereof, front pay for future lost wages and benefits;

(j) Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(k) Award Plaintiff full costs and reasonable attorney's fees; and

Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: November 2, 2016

*David G. Webbert* M.B. 5326
David G. Webbert, Bar No. 7334
Max R. Katler, Bar No. 5227
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332-0079
Tel: (207) 623-5110
E-Mail: mkatler@johnsonwebbert.com

*Attorney for Plaintiff*